# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GARY WYANT, On Behalf of Himself and All Others Similarly Situated, | ) ) Case No. _____ |
| Plaintiff, | ) ) CLASS ACTION |
| v. | ) ) CLASS ACTION COMPLAINT FOR: |
| WEST CORPORATION, TOM BARKER, LEE ADREAN, DONALD CASEY JR., ANTHONY DINOVI, PAUL GARCIA, LAURA GRATTAN, JEANETTE HORAN, MICHAEL HUBER, DIANE OFFEREINS, GERGORY SLOMA, APOLLO GLOBAL MANAGEMENT, LLC MOUNT OLYMPUS HOLDINGS, INC., and OLYMPUS MERGER SUB, INC. | ) ) (1)   Violation of § 14(a) of the Securities ) Exchange Act of 1934 ) ) ) (2)   Violation of § 20(a) of the Securities ) Exchange Act of 1934 ) ) ) (3)   Breach of Fiduciary Duties ) ) ) |
| Defendants. | ) DEMAND FOR JURY TRIAL ) |

Plaintiff Gary Wyant ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of West Corporation ("West" or the "Company"), against West and the Company's Board of Directors (the "Board" or the "Individual Defendants) for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company as a result of an unfair process for an unfair price. Also named as defendants are affiliates of Apollo Global Management, LLC, Mount Olympus Holdings, Inc. ("Parent") and Olympus Merger Sub, Inc. ("Merger Sub," collectively with Apollo Global Management, LLC and Parent, ("Apollo"). This action seeks to enjoin a stockholder vote in which Apollo, through its affiliates, will acquire each outstanding share of West common stock for

- 1 -

CLASS ACTION COMPLAINT

$23.50 per share in cash, with a total valuation of approximately $5.1 billion (the "Proposed Acquisition").

2.      The terms of the Proposed Acquisition were memorialized in a May 11, 2017 filing with the United States Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").

3.      On June 15, 2017, West filed a Preliminary Proxy Statement on Schedule Prem14A (the "Proxy") with the SEC in support of the Proposed Acquisition.

4.      Defendants breached their fiduciary duties to the Company's stockholders by agreeing to the Proposed Acquisition which undervalues West and is the result of a flawed sales process. Post-closure, West stockholders will be frozen out of seeing the return on their investment of any and all future profitability of West.

5.      Notably, as evidenced by the Proxy, the sales process leading up to the Proposed Acquisition was rife with inadequacies, including a failure of the Company Board to create a committee of disinterested directors to run the sales process. This is especially noteworthy given the massive payouts that the insider entities several Board members represent stand to gain hundreds of millions of dollars should the Proposed Acquisition be consummated.

6.      Further, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, Company Board Members and executive officers will be able to exchange large, illiquid blocks of Company stock for massive payouts, in addition to receiving cash in exchange for certain outstanding and unvested options and/or other types of restricted stock units. Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Acquisition. All stated, Company insiders stand to reap *nearly one billion dollars* in profits as a result of the Proposed Acquisition. Such large paydays upon the consummation of the Proposed Acquisition, have clearly tainted the motivations of the Board in approving it.

CLASS ACTION COMPLAINT

7.     Moreover, by virtue of several voting agreements entered into on behalf of large, inside investors to the Company, approximately 45% of the 51% vote required to pass the Proposed Acquisition has already been effectively locked up in favor of the merger.  Such unfair tactics serve to effectively disenfranchise the public stockholders of West, nearly ensuring that they will be frozen out of their stock of the Company.

8.     Finally, in violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and their fiduciary duties, Defendants caused to be filed the materially deficient Proxy on June 15, 2017 with the SEC in an effort to solicit stockholders to vote in favor of the Proposed Acquisition.  The Proxy is materially deficient and deprives West stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Acquisition.  As detailed below, the Proxy omits and/or misrepresents material information concerning, among other things: (a) the Company's financial projections; (b) the sales process of the Company; (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor Centerview Partners LLC ("Centerview"); and (d) the financial analyses performed by Centerview in support of the Proposed Acquisition.

9.     Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Acquisition or, in the event the Proposed Acquisition is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

10.     Plaintiff is an individual citizen of the State of Nebraska.  He is, and at all times relevant hereto has been, a West stockholder.

11.     Defendant West is a Delaware corporation and maintains its principal executive offices at 11808 Miracle Hills Drive, Omaha, Nebraska 68154.  West's common stock is traded on the Nasdaq GS under the ticker symbol "WSTC."

CLASS ACTION COMPLAINT

12.     Defendant Tom Barker ("Barker") is a director of West.  In addition, Barker serves as the Company's Chief Executive Officer ("CEO") and as Chairman of the Board.

13.     Defendant Lee Adrean ("Adrean") is a director of West.  In addition, Adrean serves as the Chair of the Board's Nominating and Governance Committee and as a member on the Board's Audit Committee.

14.     Defendant Donald Casey Jr. ("Casey") is a director of West.  In addition, Casey serves as a member of the Board's Compensation Committee.

15.     Defendant Anthony DiNovi ("DiNovi") is a director of West.  In addition, DiNovi previously served as the Company's Chairman of the Board from 2006 to 2008, and is the co-president of Thomas H. Lee Partners, L.P. ("THL"), a private equity firm which currently holds over 18 million shares of Company stock, translating into an approximate ownership percentage of 21.75%.

16.     Defendant Paul Garcia ("Garcia") is a director of West.  In addition, Garcia serves as the Chair of the Board's Compensation Committee and serves as a member on the Board's Nominating and Governance Committee.

17.     Defendant Laura Grattan ("Grattan") is a director of West. In addition, Grattan is a principal at THL, which currently holds over 18 million shares of Company stock, translating into an approximate ownership percentage of 21.75%.

18.     Defendant Jeanette Horan ("Horan") is a director of West.  In addition, Horan serves as a member on the Board's Audit and Compensation Committees.

19.     Defendant Michael Huber ("Huber") is a director of West.  In addition, Huber is a managing principal of Quadrangle Group, LLC ("Quadrangle") a private investment firm that holds over 7.5 million shares of Company stock, translating into an approximate ownership percentage of 9.02%.

20.     Defendant Diane Offereins ("Offereins") is a director of West.  In addition, Offereins serves as a member on the Board's Audit and Nominating and Governance Committees.

- 4 -

CLASS ACTION COMPLAINT

21.    Defendant Gregory Sloma ("Sloma") is a director of West.  In addition, Sloma serves as the Chair of the Board's Audit Committee and as a member on the Board's Compensation Committee.

22.    The defendants identified in paragraphs 12 through 21 are collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

23.    Defendant Parent is a Delaware corporation and a party to the Merger Agreement. Parent is a wholly-owned subsidiary of Apollo.

24.    Defendant Merger Sub is a Delaware corporation and a party to the Merger Agreement.  Merger Sub is a wholly-owned subsidiary of Parent, and a sub-subsidiary of Apollo.

25.    Defendant Apollo is a Delaware limited liability company and a leading global alternative investment manager.  Apollo raises, invests, and manages private equity, credit-oriented capital markets, and real estate funds.  The funds are invested across a core group of industries throughout the world.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

27.    Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

CLASS ACTION COMPLAINT

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because West maintains its principal offices in this district, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of West's common stock who are being and will be harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

30.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. According to the Company's most recent 10-Q, as of May 3, 2017, there were more than 83 million common shares of West outstanding. The actual number of public stockholders of West will be ascertained through discovery;

b.     There are questions of law and fact which are common to the Class, including *inter alia*, the following:

    i.     Whether Defendants have violated the federal securities laws;

    ii.     Whether Defendants made material misrepresentations and/or omitted material facts in the Proxy;

    iii.     Whether Defendants have breached their fiduciary duties; and

    iv.     Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Acquisition is consummated.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

CLASS ACTION COMPLAINT

d.      Plaintiff's claims are typical of the claims of the other members of the Class and

Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications with respect to individual members

of the Class which would establish incompatible standards of conduct for the party

opposing the Class;

f.      Plaintiff anticipates that there will be no difficulty in the management of this

litigation and, thus, a class action is superior to other available methods for the fair and

efficient adjudication of this controversy; and

g.      Defendants have acted on grounds generally applicable to the Class with respect

to the matters complained of herein, thereby making appropriate the relief sought herein

with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

31.     By reason of the Individual Defendants' positions with the Company as officers and/or

directors, said individuals are in a fiduciary relationship with West and owe the Company the duties of

due care, loyalty, and good faith.

32.     By virtue of their positions as directors and/or officers of West, the Individual

Defendants, at all relevant times, had the power to control and influence, and did control and influence

and cause West to engage in the practices complained of herein.

33.     Each of the Individual Defendants are required to act with due care, loyalty, good faith

and in the best interests of the Company.  To diligently comply with these duties, directors of a

corporation must:

a.      act with the requisite diligence and due care that is reasonable under the

circumstances;

b.      act in the best interest of the company;

    c.    use reasonable means to obtain material information relating to a given action or decision;

    d.    refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

    e.    avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

    f.    disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

34.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of West, are obligated to refrain from:

    a.    participating in any transaction where the directors' or officers' loyalties are divided;

    b.    participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

    c.    unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

35.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated, and are violating, the fiduciary duties they owe to West, Plaintiff and the other public stockholders of West, including their duties of loyalty, good faith, and due care.

36.    As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their West common stock in the Proposed Acquisition.

CLASS ACTION COMPLAINT

## SUBSTANTIVE ALLEGATIONS

*Company Background*

37.    West, together with its subsidiaries, provides communication and network infrastructure services. It operates through four segments: Unified Communications Services, Safety Services, Interactive Services, and Specialized Agent Services.

38.    The Unified Communications Services segment offers unified communications as a service; managed voice services comprising hosted Internet protocol (IP)-private branch exchange, enterprise call management, and hosted IP trunking solutions; network services, such as hosted managed multiprotocol label switching network, cloud-based network security, and professional and system integration services; conferencing services consisting of audio, Web, and video collaboration services; digital media services comprising Webcasting and Webinars, virtual event environments, and video managed and video bridging services; and telecom services, including toll-free, direct inward dialing, and termination services.

39.    The Safety Services segment provides carrier, next generation 9-1-1, government solutions, and database management services for wireline and wireless carriers; satellite, telematics, and cable operators; voice over IP providers; alarm/security companies; and public safety organizations, government agencies, and enterprises.

40.    The Interactive Services segment offers proactive notifications and mobility, interactive voice response self-service, cloud contact center, Web, mobile, and professional services. The Specialized Agent Services segment provides healthcare advocacy products and services, as well as cost management solutions.

41.    The Company provides its services to small and medium enterprises in telecommunications, retail, financial services, government, education, utilities, technology, and healthcare industries.

CLASS ACTION COMPLAINT

42.     It has operations in the United States, Canada, Europe, the Middle East, the Asia-Pacific, Latin America, and South America.   West was founded in 1986 and is headquartered in Omaha, Nebraska.

43.     West has shown sustained solid financial performance.   For example, in a May 9, 2017 press release announcing the Company's first quarter 2017 financial results, the Company reported positive results including a 21.4% increase in net income from the previous quarter.   Accompanying this incredible increase in net income for the Company as a whole, the divisions of the Company also saw individual success, with the Safety Services and Interactive Services divisions reporting 7.2% and 8.0% increases in revenue, respectively.

44.     Speaking on these positive results, Chairman of the Board and CEO of the Company Defendant Barker noted that, "West Corporation continued to grow its Safety Services, Interactive Services and Specialized Agent Services segments in the first quarter, as the Company won new clients, experienced increased volumes and saw further adoption of new technologies."

45.     These very positive financial results are not a recent anomaly, but, rather, are indicative of a trend of continued financial success by West.   Looking further back, one can see evidence for this typical success.   For example, in a February 1, 2017 press release announcing the Company's fourth quarter and full-year 2016 financial results, West reported a staggering 61.4% increase for income from continuing operations since the previous quarter.   Defendant Barker weighed in on these positive results, stating, "West Corporation finished the year with a fourth quarter that was stronger than expected."

46.     Barker continued his statements by touching on the Company's incredible operating cash flow increases over the 2016 financial year, stating, "In 2016, West generated record operating cash flow.   We deployed this cash flow toward repaying $191 million of our long-term debt, making two acquisitions for approximately $20 million…"   He continued that the surplus cash flow was also used by the company in "…steps to refinance [Company] debt."   Clearly, West used the boon of its

- 10 -

CLASS ACTION COMPLAINT

success in 2016 to plan for a brighter future for the Company; however, Plaintiff and other public stockholders of the Company will now be forever foreclosed from sharing in that bright future.

47.    Furthermore, those in the financial media have pegged the Company as a company to watch, with *StreetAuthority* putting out an August 18, 2016 article noting that the Company "controls an impressive amount of the 9-1-1 call market for its small cap size," and noting the Company is "positioned to expand their product line offerings and increase market penetration."

48.    Despite this upward trajectory and glowing pronouncements by management, the Individual Defendants have caused West to enter into the Proposed Acquisition, thereby depriving Plaintiff and other public stockholders of the Company the opportunity to reap the benefits of West's present and future success.

*The Flawed Sales Process*

49.    **The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants.** In September 2015, representatives of a strategic party ("Party A") contacted Defendant Barker and David Treinen ("Treinen"), the Company's Executive Vice President, Corporate Development and Planning, to express Party A's interest in potentially acquiring the Company's Safety Services segment. The Company subsequently entered into a confidentiality and standstill agreement with Party A in October 2015. The Proxy is silent as to whether this confidentiality and standstill agreement contained a "don't-ask-don't-waive" clause, and if so, under what conditions it fell away. After an in-person meeting with members of Company management in December 2015, Party A submitted a preliminary indication of interest on January 20, 2016 with respect to the potential acquisition of the Company's Safety Services segment, excluding its 911 Enable business (the "January 2016 Party A Proposal").

50.    In late November 2015, a representative of a financial sponsor ("Party B") contacted a representative of THL (along with Quadrangle, one of the Company's two financial sponsors, affiliates of which are significant stockholders in the Company and representatives of which are members of the Board), regarding the potential combination of the Company's Unified Communications Services

- 11 -

segment with a portfolio company of Party B ("Party C").  A representative of THL contacted Barker and Treinen regarding this outreach by Party B, and on January 22, 2016, Treinen had a discussion with a representative of Party B regarding such a combination.

51.    In January 2016, Company management began outreach to investment banking firms that could potentially be engaged to conduct a financial analysis of the Company and to assist the Company with its analysis of potential transactions.  The Company solicited proposals from certain investment banking firms, ultimately interviewing four finalists, including Centerview.

52.    In April 2016, the Company selected Centerview to serve as financial advisor with respect to the analysis, and the Company entered into an engagement agreement with Centerview on June 23, 2016.

53.    In April 2016, the Company and Party B entered into a confidentiality and standstill agreement in order to, among other things, permit each party to share information with the other in order to understand potential cost synergies that could result from a potential combination of the Company's Unified Communications Services segment with Party C.  The Proxy is silent as to whether this confidentiality and standstill agreement contained a "don't-ask-don't-waive" clause, and if so, under what conditions it fell away.

54.    In June 2016, a representative of a strategic party ("Party D") contacted Barker and Treinen and indicated that Party D was interested in a possible business combination involving the Company's Unified Communications Services segment or all of the Company.  Also in June 2016, the Company and Party D entered into a confidentiality agreement.  The Proxy is silent as to whether this confidentiality and standstill agreement contained a "don't-ask-don't-waive" clause, and if so, under what conditions it fell away.

55.    In August 2016, a representative of a financial sponsor ("Party E") contacted Barker and Treinen to indicate that it was interested in exploring a possible business combination involving some or all of the Company.  The Company and Party E entered into a confidentiality and standstill agreement on September 27, 2016, and representatives of Party E met with Barker and Treinen on September 28,

CLASS ACTION COMPLAINT

2016 to discuss the Company. The Proxy is silent as to whether this confidentiality and standstill agreement contained a "don't-ask-don't-waive" clause, and if so, under what conditions it fell away.

56.     At an October 27, 2016 Board meeting, the Board determined that the Company should formalize a process to explore potential strategic and financial alternatives, including conducting an outreach to potential bidders. The Board concluded that the evaluation of alternatives should include the potential sale or other disposition of one or more of West's segments, in particular the Company's Unified Communications Services segment, as well as the possible sale of the Company. It was later concluded that the Company would make a public announcement to that effect, which was included in the Company's third quarter results, released after the close of trading on November 1, 2016 (the "Announcement"). The Company disclosed in the Announcement that it had retained Centerview as its financial advisor and Sidley Austin LLP ("Sidley Austin") as its legal advisor in connection with this effort.

57.     After November 2, 2016, Centerview began preliminary outreach to potentially interested parties.

58.     After November 15, 2016, at the direction of the Board, representatives of Centerview began outreach efforts, contacting strategic buyers and financial sponsors that might be interested in acquiring the Company or one or more of its segments. In addition, Centerview responded to potentially-interested parties that approached West or Centerview in response to the Announcement. Potentially-interested parties were provided a confidentiality agreement that included standstill and anti-clubbing provisions. The standstill provisions did not include any "don't ask, don't waive" provisions that would prohibit bidders from requesting, publicly or privately, that the Company waive the standstill and permitted bidders to make proposals to the Board after West's entry into any definitive acquisition agreement.

59.     In late-November 2016, at the direction of the Board, Centerview began providing to parties that executed confidentiality agreements information related to the Company, including a confidential information memorandum ("CIMs"), which contained general background and

confidential non-public business and financial information, including financial projections for the years 2017 through 2019.  Centerview assisted the Company in managing first-round buyer due diligence and was in contact with the parties that received CIMs to answer questions and discuss the process. Among others, each of Apollo, Party A, Party B, Party D, Party E and certain other financial sponsors ("Party F," "Party G," "Party H," "Party I," "Party J," "Party K" and "Party L") were contacted by Centerview in November and December 2016, executed confidentiality agreements in November or December 2016 and were provided with CIMs and the ability to engage in first-round buyer due diligence.  On December 5, 2016, Centerview sent over 20 potentially-interested parties, including each of Apollo, Party A, Party B, Party D, Party E, Party F, Party G, Party H, Party I, Party J, Party K and Party L, a bid letter requesting a preliminary indication of interest for a potential acquisition of the Company ("Potential Whole-Company Acquisition") or a possible acquisition of one or more of the Company's segments ("Potential Segment Acquisition") by December 20, 2016.

60.    On December 14, 2016, Party E informed Centerview that it would not be submitting any proposal.

61.    On December 16, 2016, Party B submitted a written indication of interest proposing that West acquire Party C for an undetermined amount of cash and stock.

62.    On December 20, 2016 and December 21, 2016, the Company received three non-binding, preliminary indications of interest regarding a Potential Whole-Company Acquisition from Apollo, Party F and Party H, respectively, and five non-binding, preliminary indications of interest regarding a Potential Segment Acquisition from Party A, Party G, Party J, Party K and Party L, respectively.

63.    With respect to the Preliminary Indications of Interest contemplating a Potential Whole-Company Acquisition, Apollo's proposal contemplated a price per share in the range of $26.00 to $30.00, Party F's proposal contemplated a price per share in the range of $26.50 to $28.50, and Party H's proposal contemplated a price per share in the range of $25.00 to $26.00.  Party F's proposal also required that Party F be allowed to partner with Party I. Party I had previously been contacted by

- 14 -

CLASS ACTION COMPLAINT

Centerview with regard to the process, and Party F and Party I were granted permission for such partnership.

64.     With respect to the preliminary indications of interest contemplating a Potential Segment Acquisition, Party A's preliminary indication of interest contemplated an acquisition of the Safety Services segment for between $1.1 billion and $1.2 billion. Party G's preliminary indication of interest contemplated an acquisition of the Interactive Services segment for between $836 million and $912 million. Party J's preliminary indication of interest contemplated an acquisition of the Specialized Agent Services segment for between $600 million and $650 million. Party K's preliminary indication of interest contemplated an acquisition of the Unified Communications Services segment for $2.3 billion. Party L's preliminary indication of interest contemplated an acquisition of the non-Unified Communications Services segments for $1.85 billion; such indication was raised on January 5, 2017 to $2.5 billion.

65.     Also on December 20, 2016, Party D informed Centerview that it was only interested in specific assets within West's Unified Communications Services segment and thus would not be submitting any proposal.

66.     After a January 10, 2017 Board meeting, at the direction of the Board, representatives of Centerview contacted the parties that had submitted preliminary indication of interest regarding a Potential Segment Acquisition (Party A, Party, G, Party J, Party K and Party L) and informed them that, for the time being, the Company was prioritizing parties interested in a Potential Whole-Company Acquisition.

67.     On January 21, 2017, each of Apollo, Party F (together with Party I) and Party H, being the three parties potentially interested in a Potential Whole-Company Acquisition, were provided access to a virtual data room with additional documents and information regarding the Company and its segments. Also, in January 2017, Company management updated the financial projections to account for projected 2017 foreign exchange rates (as estimated by Company management) and certain

CLASS ACTION COMPLAINT

other corrections.  In February 2017, the Company made available in the virtual data room these updated financial projections for the years 2017 through 2021.

68.    Over the ensuing weeks, Centerview and Company management responded to diligence requests and participated in numerous diligence calls.  Additionally, between January 18 and January 30, 2017, Company management held in-person management meetings with each of Apollo, Party F (together with Party I) and Party H.

69.    Following management presentations, (1) representatives of Apollo communicated to Centerview that Apollo was considering both a Potential Whole-Company Acquisition, as well as a Potential Segment Acquisition; (2) representatives of Party H communicated to Centerview that Party H was interested only in a possible acquisition of the non-Unified Communications Services segments, rather than in a Potential Whole-Company Acquisition; and (3) Party F remained focused on a Potential Whole-Company Acquisition.

70.    Given the increased possibility that parties interested in a Potential Segment Acquisition would need to be partnered in order to effect a sale of the entire Company, on or around February 28, 2017, Centerview contacted Party A to ask whether Party A would be interested in bidding for the Safety Services segment and on or around February 28, 2017, Centerview contacted Party L to ask whether Party L would be interested in bidding for the non-Unified Communications Services segments. The Board determined not to renew contact with Party G, Party J, or Party K at that time. After continued discussions, Party A notified Centerview that it had determined not to participate in the process.  Party L notified Centerview that it did have continued interest in a Potential Segment Acquisition, and would bid for all three of the non-Unified Communications Services segments.  Party L was provided access to the virtual data room on March 2, 2017.

71.    On or around March 9, 2017, Party F notified Centerview that it was withdrawing from the process.

72.    As of March 24, 2017, there were currently three active bidders remaining: Apollo was still interested in a Potential Whole-Company Acquisition, and Party H and Party L were each

- 16 -

CLASS ACTION COMPLAINT

interested in a Potential Segment Acquisition of all or certain of the non-Unified Communications Services segments. After discussion, the Board directed Centerview to provide a draft merger agreement and, if applicable, draft segment purchase agreement to each of Apollo, Party H and Party L.

73.    On April 13, 2017, Apollo submitted a non-binding bid for a Potential Whole-Company Acquisition for $23.00 per share in cash, Party H submitted a non-binding bid for a possible acquisition of 100% of the non-Unified Communications Services segments for between $2.4 billion and $2.6 billion in cash, and Party L submitted a non-binding bid for a possible acquisition of 100% of the Interactive Services and Safety Services segments and certain assets within the Specialized Agent Services segment for $2.36 billion in cash.

74.    The Board subsequently determined to proceed with discussions with Apollo. Defendant DiNovi, indicated that THL was willing to sign a voting agreement to support a transaction with Apollo.

75.    Later on April 17, 2017, Defendant Huber called David C. Mussman ("Mussman") and indicated that Quadrangle was also willing to sign a voting agreement to support a transaction with Apollo.

76.    On April 19, 2017, Apollo revised the price of its proposal to $23.50 per share in cash, and continued to insist, among other things, that the definitive merger agreement include a prohibition against the payment of any cash dividends and that Apollo receive a voting agreement from each of THL, Quadrangle and Mr. and Mrs. West. Apollo also requested exclusivity as part of its revised proposal. Representatives of Apollo communicated to representatives of Centerview that this represented its best and final offer on price.

77.    At an in-person meeting of the Board on April 27, 2017, representatives of Centerview informed the Board that Party H had confirmed a preliminary interest in a sponsored spin-off transaction involving its investment in the non-Unified Communications Services segments, but that

CLASS ACTION COMPLAINT

such a transaction would require additional time and due diligence.   Nevertheless, the Board directed Centerview and Sidley Austin to continue to negotiate with Apollo.

78.    The Board also requested that Barker contact Mr. and Mrs. West and discuss their willingness to support the Apollo proposal by entering into a voting agreement, who agreed to enter into such voting agreement on May 6, 2017.

79.    The Board held a telephonic meeting on May 7, 2017 with its financial and legal advisors.  At the meeting, the Board determined that management could discuss with Apollo its plans for post-closing management compensation and arrangements.  Following that discussion, Defendant DiNovi noted that THL and Quadrangle would be willing to provide between $3 million and $5 million (in the aggregate) of their proceeds from the transaction to fund an additional retention plan for the Company's senior management, payable at the closing of the transaction.

80.    The Board held a telephonic meeting on May 9, 2017 with its financial and legal advisors.  Representatives of Centerview reviewed with the Board Centerview's financial analysis of the merger consideration, and rendered to the Board an oral opinion, which was subsequently confirmed by delivery of a written opinion dated such date, that the merger consideration to be paid to the holders of West common stock (other than certain shares of West common stock as specified in such opinion) pursuant to the merger agreement was fair, from a financial point of view, to such holders.

81.    On May 9, 2017, the Merger Agreement was executed by the Company, Parent and Merger Sub; each of THL, Quadrangle and Mr. and Mrs. West executed voting agreements with Parent; and the Company entered into an indemnification agreement with each of Mr. and Mrs. West.  The Company and Apollo subsequently announced the Proposed Acquisition via joint press release.

***The Proposed Acquisition***

82.    On May 9, 2017, the Company and Apollo issued a joint press release announcing that West had agreed to be acquired by Apollo in the Proposed Acquisition.  The press release states, in relevant part:

> **OMAHA, NE, May 9, 2017 –** West Corporation (Nasdaq: WSTC) (the "Company" or "West"), a global provider of communication and network infrastructure services, today

CLASS ACTION COMPLAINT

announced it has entered into a definitive agreement with affiliates of certain funds managed by affiliates of Apollo Global Management, LLC (the "Apollo funds") (together with its consolidated subsidiaries, "Apollo") (NYSE: APO), a leading global alternative investment manager, pursuant to which the Apollo funds will acquire all of the outstanding shares of West common stock for $23.50 per share in cash.

The purchase price represents a premium of approximately 17.5 percent over West's closing stock price on November 1, 2016, the last trading day prior to the announcement that the Company initiated a process to explore strategic and financial alternatives. The proposed transaction has an enterprise value of approximately $5.1 billion, including net debt.

The West Board of Directors has unanimously approved the agreement with the Apollo funds and recommends that West stockholders vote in favor of the proposed transaction. Certain West stockholders, including Thomas H. Lee Partners, L.P., Quadrangle Group LLC, Gary L. West and Mary E. West, who in the aggregate beneficially own approximately 45 percent of West's outstanding common stock, have committed to vote in favor of the proposed transaction, subject to certain customary conditions, at a special meeting of West stockholders.

"We are pleased to reach this agreement with the Apollo funds, which follows a comprehensive review of alternatives initiated by West's Board of Directors in November," said Tom Barker, Chairman and Chief Executive Officer of West. "We believe this transaction achieves our goal of maximizing value for West stockholders and positions the Company for continued success. Apollo values our team, assets and vision for the future. We look forward to working closely with Apollo as we continue to grow and strengthen our business."

Mr. Barker continued, "We began this process with the acknowledgement of the disparate trends in our various businesses. Over the past six months, we have evaluated a wide range of strategic and financial alternatives, including the sale or separation of assets; various balance sheet options; as well as continuing to operate under our current structure. We believe strongly that the transaction we are announcing today is the best outcome for our stockholders, employees and customers."

"We are extremely excited for our funds to acquire West," said Matthew Nord, Senior Partner at Apollo. "West is the leader in global conferencing and collaboration services, and is well-positioned to capitalize on customer migration to cloud-based solutions and continue to grow its Safety Services, Interactive Services and Health Advocate Solutions businesses. We look forward to working with West's talented and dedicated team to continue the strong heritage of providing the highest-level of service and care to its customers."

Transaction Details

CLASS ACTION COMPLAINT

The transaction is expected to close in the second half of the year. The transaction is subject to receipt of certain regulatory approvals, including expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act, approval by the U.S. Federal Communications Commission and certain state and foreign regulatory approvals, as well as West stockholder approval and other customary closing conditions. Following the transaction West will become a privately held company and shares of West's common stock will no longer be listed on any public market.

As a condition to the transaction, West has agreed to suspend payment of its quarterly dividend, effective immediately.

### *The Inadequate Merger Consideration*

83.    Significantly, analyst expectations, the Company's strong market position, extraordinary growth, and positive future outlook establish the inadequacy of the merger consideration.

84.    First, the consideration to be provided pursuant to the Proposed Acquisition significantly undervalues the Company. The merger consideration does not adequately reflect the intrinsic value of the Company. Moreover, the merger consideration does not adequately take into consideration how the Company is performing, considering increases in revenues reported by the Company recent quarters of the past financial year. Notably, the Company has traded as high as $28.57 per share within a month before the announcement of the Proposed Acquisition, a valuation that is approximately 21.57% higher than that contained in the Proposed Acquisition.

85.    Next, analyst coverage indicates a high target above the deal price, with analysts at Royal Bank of Canada valuing the Company at $26.00 per share as recently as January of 2017, a value that is over 9.88% greater than the valuation offered to Plaintiff and other public stockholders in the Proposed Acquisition.

86.    Finally, those in the financial media have been quick to criticize the Proposed Acquisition's value to public stockholders and the Company. Notably, in a May 10, 2017 *Bloomberg Gadfly* article, Gillian Tan ("Tan") noted that the consideration offered in the Proposed Acquisition was a discount to its closing price the day before the Proposed Acquisition was announced. In addition, Tan noted that both the long term institutional investors that hold a substantial percentage of the Company, THL and Quadrangle, will "likely face pressure to sell."

CLASS ACTION COMPLAINT

87.     The opportunity to invest in such Company on the precipice of success in expanding its business sectors is a great coup for Apollo; however, it undercuts the foresight and investment of Plaintiff and all other public stockholders who have done the same.

88.     Moreover, post-closure, West stockholders will be completely cashed out from any and all ownership interest in the Company, forever foreclosing them from receiving any future benefit in their investment as West continues on its upward financial trajectory.

89.     It is apparent from these statements and the facts set forth herein that this deal is designed to maximize benefits for Apollo at the expense of West and West's stockholders, which indicates that West stockholders were not an overriding concern in the formation of the Proposed Acquisition.

***Preclusive Deal Mechanisms***

90.     The Merger Agreement contains certain provisions that unduly benefit Apollo by making an alternative transaction either prohibitively expensive or otherwise impossible.  Significantly, the Merger Agreement contains a termination fee provision that requires West to pay $72 million to Apollo if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, West must pay this termination fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

91.     The Merger Agreement also contains a "No Solicitation" provision that restricts West from considering alternative acquisition proposals by, *inter alia*, constraining West's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an "unsolicited bona fide written Acquisition

CLASS ACTION COMPLAINT

Proposal" if it constitutes or is reasonably calculated to lead to a "Superior Proposal" as defined in the Merger Agreement.

92.    Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. The Individual Defendants agreed to provide Apollo information in order to match any other offer, thus providing Apollo access to the unsolicited bidder's financial information and giving Apollo the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Apollo.

93.    Finally, certain Company stockholders, including THL, Quadrangle, and Company founders Gary L. West and Mary E. West, who own, in aggregate approximately 45% of outstanding West common stock have entered into voting and support agreements, thereby locking up their stock to vote in favor of the Proposed Acquisition. Notably, the Merger Agreement contains no "majority of the minority" provision, thus requiring only approximately 6% of all public stockholders to approve the Proposed Acquisition for it to be consummated.

94.    These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

95.    Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition.

***Potential Conflicts of Interest***

96.    There is strong evidence that the Proposed Acquisition may be tainted by the self-interest of the Individual Defendants. Certain insiders stand to receive massive financial benefits as a result of the Proposed Acquisition, as the large, illiquid chunks of shares currently held by certain Defendants and Company insiders will be exchanged for cash. For example, upon the consummation of the Proposed Acquisition, Defendants DiNovi, Grattan, and Huber, and the private equity firms they

represent, stand to make over *five hundred sixteen million dollars* from an exchange of their currently owned stock of the Company.

97.     Additionally, Company insiders and founders Gary L. West and Mary E. West will reap a cash benefit of over *three hundred ninety million dollars* from an exchange of their currently owned stock in the Company.

98.     Other Company insiders own large, illiquid portions of Company stock as follows:

| Name and Address of Beneficial Owners(1) | Shares Beneficially Owned | Percent of Common Shares |
|---|---|---|
| **5% Stockholders** | | |
| Thomas H. Lee Partners Funds(2) | 18,176,113 | 21.3% |
| Gary L. West(3) | 8,452,009 | 9.9% |
| Mary E. West(4) | 8,340,935 | 9.8% |
| The Vanguard Group(5) | 5,126,867 | 6.0% |
| Quadrangle Funds(6) | 3,781,961 | 4.4% |
| **Directors and Named Executive Officers** | | |
| Lee Adrean | 19,796 | * |
| Thomas B. Barker(7) | 2,163,876 | 2.5% |
| Ronald R. Beaumont(8) | 121,775 | * |
| Nancee R. Berger(9) | 442,816 | * |
| Donald M. Casey | 8,559 | * |
| Anthony J. DiNovi(10) | — | — |
| J. Scott Etzler(11) | 177,581 | * |
| Paul R. Garcia | 28,384 | * |
| Laura A. Grattan(10) | — | — |
| Jeanette A. Horan | 8,570 | * |
| Michael A. Huber | — | — |
| Jan D. Madsen | 73,258 | * |
| Diane E. Offereins | 7,793 | * |
| Gregory T. Sloma | 24,984 | * |
| All directors and executive officers as a group (14 persons)(12) | 4,020,169 | 4.7% |

\*     Less than 1%

99.     In addition, under the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, each outstanding Company option will be fully vested and cancelled, and each holder of a cancelled Company option will receive a payment in cash equal to the product of (i) the total number of shares subject to the cancelled Company option and (ii) the excess, if any, of (A) the merger consideration over (B) the exercise price per share subject to the cancelled Company option, without interest, less any required tax withholding.

CLASS ACTION COMPLAINT

100.    Furthermore, under the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, each outstanding stock unit award and restricted stock unit award will be converted into the right to receive a payment in cash equal to the sum of (i) the merger consideration multiplied by the number of shares subject to each such award and (ii) the dividend equivalents accrued on such award prior to the closing date, and to the extent required by an existing award agreement such cash amount will be held in escrow and become vested and payable in accordance with the terms of the awards on the vesting schedule set forth in the awards, less any required tax withholding.

101.    Significantly, members of the Company's Board, executive team, and other Company insiders collectively own thousands of such Company stock award for which they will receive large cash payouts not shared amongst Plaintiff and other public stockholders of the Company.

102.    Specifically, non-employee directors of the Company will receive the following payouts as a result of their ownership of Company stock awards:

| Non-Employee Directors | Number of Shares of Restricted Stock (#)[1] | Value of Restricted Stock Awards ($)[1] |
|---|---|---|
| Lee Adrean | 4,101 | 96,374 |
| Donald M. Casey, Jr. | 4,508 | 95,199 |
| Anthony J. DiNovi | — | — |
| Paul R. Garcia | 4,159 | 97,737 |
| Laura A. Grattan | — | — |
| Jeanette A. Horan | 4,025 | 94,588 |
| Michael A. Huber | — | — |
| Diane E. Offereins | 4,543 | 106,761 |
| Gregory T. Sloma | 4,159 | 97,737 |

103.    Members of the Company's executive team will receive additional compensation for certain vested Company stock awards as follows:

| Executive Officers | Number of Vested Stock Options (#)[1] | Value of Vested Stock Options ($)[1] | Number of Notional Shares in Deferred Compensation Plan (#)[2] | Value of Notional Shares in Deferred Compensation Plan ($)[2] | Estimated Total Consideration ($) |
|---|---|---|---|---|---|
| Thomas B. Barker* | 770,624 | — | 394,947 | 9,281,255 | 9,281,255 |
| Ronald R. Beaumont | 53,749 | 20,700 | — | — | 20,700 |
| Nancee R. Berger | 125,000 | — | 370,228 | 8,700,358 | 8,700,358 |
| J. Scott Etzler | 88,750 | 15,525 | 88,323 | 2,075,591 | 2,091,116 |
| Jon R. Hanson | 62,500 | — | 37,800 | 888,300 | 888,300 |
| Rod J. Kempkes | 31,250 | — | 94,866 | 2,229,351 | 2,229,351 |
| Jan D. Madsen | — | — | 47,468 | 1,115,498 | 1,115,498 |

- 24 -

CLASS ACTION COMPLAINT

| David C. Mussman | 100,000 | — | 147,930 | 3,476,355 | 3,476,355 |
| Nicole B. Theophilus | — | — | 257 | 6,040 | 6,040 |
| David J. Treinen | 100,000 | — | 144,095 | 3,386,233 | 3,386,233 |

104.    Also, members of the Company's executive team will receive additional compensation for certain unvested Company stock awards as follows:

| Executive Officers | Number of Stock Units and Restricted Stock Awards (#)[1] | Value of Stock Units and Restricted Stock ($)[1] | Number of Unvested Stock Options (#)[2] | Value of Unvested Stock Options ($)[2] | Number of Notional Shares in Deferred Compensation Plan (#)[3] | Value of Notional Shares in Deferred Compensation Plan ($)[3] | Estimated Total Consideration ($) |
|---|---|---|---|---|---|---|---|
| Thomas B. Barker* | 450,000 | 11,587,500 | — | — | — | — | 11,587,500 |
| Ronald R. Beaumont | 93,200 | 2,297,075 | 10,000 | 6,900 | — | — | 2,303,975 |
| Nancee R. Berger | 141,350 | 3,452,225 | — | — | — | — | 3,452,225 |
| J. Scott Etzler | 139,750 | 3,444,438 | 7,500 | 5,175 | — | — | 3,449,613 |
| Jon R. Hanson | 93,200 | 2,297,075 | — | — | — | — | 2,297,075 |
| Rod J. Kempkes | 93,200 | 2,297,075 | — | — | — | — | 2,297,075 |
| Jan D. Madsen | 121,000 | 2,976,591 | — | — | 11,867 | 278,875 | 3,255,266 |
| David C. Mussman | 122,250 | 3,006,469 | — | — | — | — | 3,006,469 |
| Nicole B. Theophilus | 45,700 | 1,094,200 | — | — | 129 | 3,032 | 1,097,232 |
| David J. Treinen | 139,700 | 3,443,263 | — | — | — | — | 3,443,263 |

105.    Certain employment agreements with several West officers or directors are entitled to severance packages should their employment be terminated under certain circumstances.  These "golden parachute" packages are significant, and will grant each director or officer entitled to them, at the very least, hundreds of thousands of dollars, compensation not shared by West's common stockholders.

106.    The following table sets forth the golden parachute compensation for certain West directors and officers, as well as their estimated value payable:

**Golden Parachute Payments[1]**

| Name | Cash[2] | Equity[3] | Pension/ NQDC[4] | Perquisites/ Benefits[5] | Tax Reimbursement[6] | Other | Total |
|---|---|---|---|---|---|---|---|
| Thomas B. Barker *Chief Executive Officer* | 7,490,244 | 11,587,500 | — | 23,554 | — | 15,000 | 19,116,298 |
| Ronald R. Beaumont *President—Telecom Services and President— Safety Services* | 1,625,534 | 2,303,975 | — | 7,849 | — | 15,000 | 3,952,358 |
| Nancee R. Berger | 3,542,641 | 3,452,225 | — | 44,121 | — | 15,000 | 7,053,987 |

- 25 -

CLASS ACTION COMPLAINT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *President and Chief Operating Officer* | | | | | | | |
| J. Scott Etzler *President—Unified Communications Services and President—Revenue Generation* | 1,966,027 | 3,449,613 | — | 7,069 | — | 15,000 | 5,437,709 |
| Jan D. Madsen *Chief Financial Officer* | 1,770,904 | 2,976,391 | 278,875 | 9,880 | — | 15,000 | 5,051,050 |

107.     Thus, while the Proposed Acquisition is not in the best interests of West's public stockholders, it will produce lucrative benefits for the Company's officers and directors.

**The Materially Misleading and/or Incomplete Preliminary Proxy**

108.     On June 15, 2017, West filed with the SEC a materially misleading and incomplete Proxy that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

<u>Omissions and/or Material Misrepresentations Concerning West's Financial Projections</u>

109.     The Proxy fails to provide material information concerning financial projections provided by West's management, reviewed with West's management and relied upon by Centerview in its analyses.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-03 (Del. Ch. 2007).

110.     Specifically, while the Proxy provides certain projected financial information for West, the Proxy fails to provide the following additional line items:

       a.     Taxes (or tax rate);

       b.     Capital expenditures;

       c.     Changes in net working capital;

       d.     Stock-based compensation expense;

       e.     EBITDA;

CLASS ACTION COMPLAINT

      f.      Interest Expense;

      g.     Non-recurring items;

      h.     Depreciation and amortization;

      i.      Earnings; and

      j.      Net operating profit.

111.    Significantly, the Proxy fails to provide a reconciliation of all non-GAAP to GAAP financial metrics.  When a company discloses information in a proxy that includes non-GAAP financial metrics, such as Adjusted EBITDA and Unlevered Free Cash Flow, the company must also disclose comparable GAAP metrics and a quantitative reconciliation of the non-GAAP metrics to GAAP metrics.  *See* 17 C.F.R. § 244.100 (requiring that the disclosure of material non-GAAP financial measures be accompanied by an identification and presentation of the most directly comparable GAAP measure, and a reconciliation of the non-GAAP measure to the comparable GAAP measure by a clearly understandable method).  Indeed, the SEC has repeatedly emphasized that disclosure of unreconciled non-GAAP projections is inherently misleading, and has heightened its scrutiny of the use of such projections.

112.    The SEC has recently increased its scrutiny of the use of non-GAAP financial metrics in communications with stockholders. Recently, former SEC Chairwoman Mary Jo White stated that the frequent use by publicly traded companies of unique company specific non-GAAP financial measures implicates the centerpiece of the SEC's disclosure regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their

approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

113.    Here, the Proxy states, "Non-GAAP financial measures, including Adjusted EBITDA and Unlevered Free Cash Flow, have limitations as analytical tools, and you should not consider any non-GAAP financial measure in isolation or as a substitute for analysis of our results as reported under GAAP."  Proxy at 48.

114.    Without accurate projection data presented in the Proxy, Plaintiff and other stockholders of West are unable to properly evaluate the Company's true worth, the accuracy of Centerview's financial analyses, or make an informed decision whether to vote in favor of the Proposed Acquisition. Indeed, Centerview uses a non-GAAP measure (2017 Adjusted EBITDA) for its Selected Public Company Analysis and for its Selected Transactions Analysis (LTM Adjusted EBITDA).

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Acquisition*

115.    The Proxy fails to provide material information concerning the process conducted by the Board and the events leading up to the Proposed Acquisition.  In particular, the Proxy fails to disclose:

a.    The Proxy fails to disclose whether any confidentiality agreements executed by West and the prospective bidders contained standstill and/or "don't ask, don't waive" provisions that are or were preventing those counterparties from submitting superior offers to acquire the Company.  Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with

---

[1] Mary Jo White, Chairwoman, SEC, Keynote Address at the International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

CLASS ACTION COMPLAINT

a superior offer, they are or were permitted to do so, when in fact they are or were contractually prohibited from doing so.

b.      The reason no independent committee of the Board comprised of disinterested directors was created to run the sales process.

c.      The Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of West's officers and directors, including who participated in all such communications.  Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses Performed by Centerview*

116.    The Proxy contains information regarding Centerview's so-called fairness opinion.  However, the Proxy fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

117.    The Proxy does not disclose material details concerning the analyses performed by Centerview in connection with the Proposed Acquisition, including (among other things):

i.  Selected Public Company Analysis

The Proxy fails to disclose the following: (i) whether Centerview performed any benchmarking analysis for the selected companies; and (ii) how the following statement at page 52 of the Proxy affected Centerview's opinion: "Centerview also observed that the Company consistently traded at a significant discount to the median of the enterprise value / estimated next

CLASS ACTION COMPLAINT

twelve months Adjusted EBITDA multiple for the selected companies over the prior three years."

ii.   Selected Transactions Analysis

The Proxy fails to disclose the following: (i) whether Centerview performed any benchmarking analysis for the selected transactions; and (ii) the transaction values for the transactions utilized in the analysis.

iii.   Discounted Cash Flow Analysis

The Proxy fails to disclose the following: (i) the individual inputs and assumptions utilized by Centerview to derive the discount rate range of 8.5%-9.5%; (ii) the range of terminal values of West; (iii) Centerview's basis for applying perpetuity growth rates ranging from 1.0% to 2.0%; and (iv) the net debt of the Company as of 3.31.17.

118.   Without the omitted information identified above, West's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests. Moreover, without the key financial information and related disclosures, West's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Acquisition is in their best interests.

## FIRST COUNT

### Claim for Breach of Fiduciary Duties

### (Against the Individual Defendants)

119.   Plaintiff repeats all previous allegations as if set forth in full herein.

120.   The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiffs and the Company's public stockholders.

121.   By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in West.

- 30 -

CLASS ACTION COMPLAINT

122. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of West by entering into the Proposed Acquisition through a flawed and unfair process and failing to take steps to maximize the value of West to its public stockholders.

123. Indeed, Defendants have accepted an offer to sell West at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

124. Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote in favor of the Proposed Acquisition.

125. The Individual Defendants dominate and control the business and corporate affairs of West, and are in possession of private corporate information concerning West's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of West which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

126. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

127. As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of West's assets and have been and will be prevented from obtaining a fair price for their common stock.

128. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

CLASS ACTION COMPLAINT

129.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

## Violations of Section 14(a) of the Exchange Act

## (Against All Defendants)

130.    Plaintiff repeats all previous allegations as if set forth in full herein.

131.    Defendants have disseminated the Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Acquisition.

132.    Section 14(a) of the Exchange Act provides, "[n]o solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

133.     The Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

134.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

135.    The Individual Defendants were at least negligent in filing a Proxy that was materially misleading and/or omitted material facts necessary to make the Proxy not misleading.

CLASS ACTION COMPLAINT

136.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of his entitlement to decide whether to vote his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote on the Proposed Acquisition.

### THIRD COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants and Apollo)

137.    Plaintiff repeats all previous allegations as if set forth in full herein.

138.    The Individual Defendants and Apollo were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants and Apollo knew or should have known that the Proxy was materially misleading to Company stockholders.

139.    The Individual Defendants and Apollo were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants and Apollo were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants and Apollo were able to, and did, control the contents of the Proxy. The Individual Defendants and Apollo were provided with copies of, reviewed and approved, and/or signed the Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

140.    The Individual Defendants and Apollo also were able to, and did, directly or indirectly, control the conduct of West' business, the information contained in its filings with the SEC, and its

CLASS ACTION COMPLAINT

public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants and Apollo knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Proxy was misleading.  As a result, the Individual Defendants and Apollo are responsible for the accuracy of the Proxy and are therefore responsible and liable for the misrepresentations contained herein.

141.    The Individual Defendants acted as controlling persons of West within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause West to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled West and all of its employees.  Additionally, Apollo also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.  As alleged above, West is a primary violator of Section 14 of the Exchange Act and SEC Rule Proxy.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.    Enjoining the Proposed Acquisition;

C.    In the event defendants consummate the Proposed Acquisition, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.    Directing the Individual Defendants to exercise their fiduciary duties to commence a

- 34 -

CLASS ACTION COMPLAINT

sale process that is reasonably designed to secure the best possible consideration for West and obtain a transaction which is in the best interests of West and its stockholders;

      F.     Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

      G.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

      H.     Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: June 26, 2017

GARY WYANT, On Behalf of Himself and All Others Similarly Situated

By:    s/David W. Rowe
       David W. Rowe - 19155
       **KINSEY ROWE BECKER & KISTLER, LLP**
       3800 VerMaas Place, Suite 100
       Telephone: 402.434.9050
       Facsimile: 402.438-1654
       drowe@krbklaw.com

       Local Counsel for Plaintiff

OF COUNSEL

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Telephone: 610.667.6200
esmith@brodskysmith.com
mackerman@brodskysmith.com

*Attorneys for Plaintiff*

- 35 -

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT